Filed 5/26/26  P. v. Alander CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Tehama)

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN PATRICK ALANDER,<br>    Defendant and Appellant. | C100990<br><br>(Super. Ct. No. 23CR900007) |

Defendant John Patrick Alander appeals from his convictions for criminal threats and resisting arrest.  Defendant raises multiple claims on appeal:  (1) the trial court improperly admitted evidence of his out-of-court statement that he had recently served a substantial prison term for murder; (2) the court failed to instruct the jury regarding the limited purpose of the evidence of his out-of-court statement; (3) the prosecutor prejudicially erred during closing argument by referring to facts not in evidence; and (4) the court abused its discretion when it declined to dismiss his prior convictions for purposes of sentencing.  We affirm.

1

## FACTS AND PROCEEDINGS

*Background*

Sharon lived in a house on a rural road in Red Bluff in Tehama County. Her son, Colton, and his wife, Karri, lived in a trailer on her property with their two children. The property included a gate that was near her house, and 40 to 50 feet from the trailer. There was a motion-activated light next to the gate.

In October 2022, defendant's sister bought the house across the street from Sharon's; defendant lived in the house with his girlfriend, Candy. Sharon's husband and defendant had previously had a confrontation, after which Sharon directed her husband to apologize to defendant to avoid further confrontation.

*The Incident*

On the evening of February 4, 2023, Sharon heard her dogs barking outside her house. She went outside and saw a man she later recognized as defendant shining a flashlight on her property and Colton's trailer. The man screamed, " 'Shut up wolf or I will fucking shoot you.' " Sharon did not know the identity of the man at the time, but she knew the person was one of her neighbors because only her neighbors knew her dog was part wolf. She told defendant, whom she recognized, " 'If you calm down, my dogs won't bark at you.' " Defendant, who was shining his flashlight in Sharon's face, responded, " 'Shut up, bitch, and get back in the house.' " He then said, " 'Tell your punk-ass husband to come out here, come apologize to me. Big pussy.' " When defendant approached Sharon's gate, she asked him not to. Defendant responded, " 'Shut up, bitch. I got a .45, and I will shoot you,' " and then, " 'I will take y'all out.' " Sharon could see the light from defendant's flashlight, but she did not see a gun or other object in his hand.

Sharon testified at trial that defendant's threats caused her to fear for her life and her family. She took his threat seriously because, when defendant moved into the house across the street, he told Sharon's husband that "he had been at Pelican Bay prison for --

2

for murder."[1]  Further, defendant was loud, intoxicated, and swearing, and she believed he had a gun because he said he did.

At the time of the incident, Karri and Colton were in the trailer with their children. Karri heard yelling and dogs barking.  Either Colton or Karri opened the door, and Karri heard a man screaming.  The man said, " 'I have a .45 on me, I will kill you, bitch.' " Karri heard Sharon respond, " 'Go away,' " and " '[l]eave my dogs alone.' "  Karri recognized defendant because he had moved in recently and she had seen him before, although she did not know his name and could not see him "super clear[ly]."

Sharon's neighbor, Raymond, also heard the incident.  Raymond heard a lot of yelling and screaming, and as he approached Sharon's house, he heard a man yell, " 'Fuck you, bitch,' " " 'I will blow you[r] head off,' " and " 'I have been to prison, I am not afraid to go back.' "  Raymond then saw the man walk back to his house, which was across the street from Sharon's.  Raymond could not tell who was being threatened, and he did not see a gun.  Raymond did not recognize the man's voice, but as the man approached his property, the man resembled defendant, although Raymond did not identify defendant during trial.

*911 Calls and Defendant's Arrest*

Karri called 911.  She reported that her neighbor was threatening Sharon with a gun, although she did not see a gun.  She said the man had a flashlight and was "screaming I have a .45 on me you stupid bitch."  The dispatcher advised Karri to tell Sharon to go inside, and to lock their doors.

Colton went outside to tell Sharon to go inside.  Sharon told defendant Karri had called 911, and defendant left in the direction of his house.  Defendant was ranting, raving, and yelling.  Sharon then went back inside her house, and she calmed down and

---

[1]  Defendant claims this testimony was improperly admitted; we address that claim in the Discussion, *post*.

felt better because defendant left. Sharon owned firearms, but the only weapon she had in her house that was not locked away in a safe was a BB gun.

The 911 dispatcher called Sharon. Sharon described defendant as "very drunk and very vulgar and got a flashlight shining up and down," and said defendant shined a flashlight in her eyes when she opened the door. She did not see a firearm, but thought defendant possessed a firearm because "[h]e told us I got a 45 on me bitch." She added that defendant was "rambling" in his driveway at that time, had admitted being drunk, and had said, "tell your punk ass husband to come out here and fight me I got a 45 I ain't afraid of him." Sharon informed the dispatcher that defendant "told us he's got out of Pelican Bay after fifteen years so I mean …."

The dispatcher advised Sharon to lock her door, which she did. Sharon had not locked her door previously because she was watching defendant out the window to ensure he was leaving, and she did not usually lock her doors.

Sharon testified at trial that she did not call 911 herself because the incident "happened pretty fast"; the entire incident lasted three to four minutes. She acknowledged she sounded calm and even laughed during the 911 call, but explained that she habitually laughs when nervous. She added that defendant had already left, and she felt better knowing law enforcement was en route, although she was still scared of defendant because he lived across the street.

Sheriff's deputies arrived at defendant's house and issued commands over the public address system. Defendant's girlfriend, Candy, left the house, and deputies eventually arrested defendant after he fell while being pursued through his backyard. Defendant complied with deputies' commands after he fell.

*Sharon's and Karri's Statements*

Following defendant's arrest, Deputy Joseph Foster interviewed Sharon and Karri; the interviews were played for the jury. Karri stated that Colton opened the door when they heard the dogs barking, and they could hear a man screaming at Sharon that "he had

4

a .45 on him and, 'I'm going to kill you bitch. I have a .45.' " Karri did not go outside, but Sharon was outside trying to get her dogs. Karri did not see anything other than the man at the gate with a flashlight, but "heard somebody threatening my mother-in-law with a gun and I have my babies over there." Karri did not know the man, who had lived in the house across the street for only a couple months.

Sharon described defendant but acknowledged that she had not seen him "up super close because he's always been belligerent and rude." She added that defendant had just moved in, and he was usually at home only at night, when he was often "out hollering." Sharon did not want defendant to know they had called 911 because she was scared; Karri added that she was scared, too.

Sharon then described what had occurred that night. She stated defendant "was walking down the street screaming at the top of his lungs, shining his flashlight all in our property and kept. … The dogs were barking so he kept saying, 'F you, this' to the dogs and everything. And then I went out and I says, 'Hey buddy.' I said, 'Why don't you ….' I didn't know it was him. I just knew it was some drunk guy at first walking down the road." She continued, "And he goes, 'Yeah tell that f'ing pussy to come out and I'll kick his ass right now and My old lady will whoop yours.' And he goes, 'I got .45. I ain't in front of none of you.'[2] And I said, 'I keep a shotgun, buddy.' Which I don't [inaudible], but I didn't want him to know that I'm. … But I told him, I said, 'I keep a shotgun around here too and my dogs. I keep me a two gauge shot and I got four dogs in here.' My dogs do bark." She added that defendant said, " 'I'll fuck you and your husband up.' He goes, 'I got a .45 right here.' " Karri interjected that defendant had called Sharon "a stupid bitch," and Sharon agreed that defendant said, " 'You f'ing

<hr/>

**2** Our review of the body camera footage indicates that Sharon may have said "I ain't *afraid* of none of you," rather than "I ain't *in front* of none of you." (Italics added.) This discrepancy does not affect the issues on appeal.

bitch.'  He goes, 'You stupid f'ing bitch.'  He goes, 'I'll fuck you up and your dogs.' "  Karri believed defendant would carry out his threats, and Sharon noted she was scared of him.

Sharon continued, "You ought to hear him out here sometimes."  Karri said, "You can hear them now.  They're like this … [a]ll the time."  Sharon added, "At least when they're out here, at least two.  …  And they're bringing homeless people here that are living in these trailers back here.  And the homeless people sometimes walk down the road with blankets and leave them down there, and I don't know what they're having them do."  Deputy Foster replied, "Sounds like we need to make a project out of this place," and Sharon agreed defendant "needs to go bye-bye."

Sharon testified at trial that she said defendant needed to "go bye-bye" due to "the way they were over there."  She indicated they were "[l]oud and scary," and there was "[l]ots of fighting."  She reiterated that defendant brought people experiencing homelessness to live on his property, and he yelled and screamed at them.  Twice after defendant moved in, Sharon saw unhoused people walking down the street because they felt abused and defendant had kicked them off his property.

Deputy Foster observed Karri repeated herself and was "a little nervous" and "fidgeting."  He noted Sharon did not seem nervous, except briefly when she mentioned her own firearm possession, although she exhibited signs of anger and nervousness as she recounted the events, as if projecting the tone of the statements made.

Sharon testified the threats she mentioned during the interview with Foster were not the only threats defendant made that night, and she did not tell Foster everything that had happened.  Sharon recalled telling the whole story to other deputies on the scene, including a female deputy, although she acknowledged she did not recall whether the other deputy was a woman.  Foster clarified there were no female deputies at the scene, and Sharon did not give any other statements on the night of the incident.

6

*Procedural History*

A jury found defendant guilty of felony criminal threats (Pen. Code, § 422, subd. (a); count 1)[3] and misdemeanor resisting, delaying, or obstructing a peace officer (§ 148, subd. (a)(1); count 2). In a bifurcated trial, the jury found true the allegation as to count 1 that defendant was previously convicted of two or more serious or violent felonies as defined in sections 667, subdivision (d) and 1170.12, subdivision (b), and that the prior convictions were serious felonies for purposes of imposing five-year prior conviction enhancements under section 667, subdivision (a)(1).

The trial court sentenced defendant to 25 years to life in prison on count 1, plus a consecutive term of 10 years for the two prior conviction enhancements (§ 667, subd. (a)(1)). The court imposed a concurrent term of one year on count 2.

Defendant timely filed a notice of appeal.

## DISCUSSION

### I.  Evidentiary Claim

Defendant contends the trial court abused its discretion and violated his constitutional right to due process by admitting Sharon's testimony that he told her husband that he had been convicted of murder and was previously incarcerated at Pelican Bay State Prison (Pelican Bay). We review trial court rulings as to the admissibility of evidence under the familiar abuse of discretion standard. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 201; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 32-33.) As we will explain, no abuse of discretion appears.

### A. Procedural Background

Defendant filed a pretrial motion to prohibit the prosecution and any prosecution witness from referring to the name or location of any penal institution where defendant may have been previously incarcerated. He argued that such evidence was irrelevant

---

[3] Further undesignated statutory references are to the Penal Code.

(Evid. Code, § 350), inadmissible character evidence (*id.*, § 1101, subd. (a)), and substantially more prejudicial than probative (*id.*, § 352).

The trial court held an Evidence Code section 402 hearing on defendant's motion. Sharon testified at the hearing that approximately one to four months before defendant's alleged threats, her husband said that defendant had told him that he served 14 years at Pelican Bay for murder. Sharon acknowledged that defendant's statement was not on her mind during the charged incident; instead, she was thinking about defendant being "drunk and abusive" and that he "ha[d] been a bad person before," and she "was just worried about [her] family." However, she subsequently agreed that her knowledge of defendant's statement "probably" contributed "some" to her fear on the night of defendant's threats, and she took him more seriously because she knew his history.

The trial court admitted the evidence as relevant to Sharon's state of mind and not cumulative of other evidence of her fear, although the court directed the prosecutor to not ask Sharon about the statement directly. The court noted it would be required to provide the jury with a limiting instruction if Sharon testified about the statement, but no limiting instruction was provided.[4]

Sharon testified about defendant's statement as we set forth *ante*, and her comment about defendant's statement to the 911 dispatcher was played for the jury. Defense counsel did not cross-examine Sharon regarding the evidence. Nothing in the record suggests that defendant was convicted of murder or incarcerated at Pelican Bay.

B. Analysis

To prove the charge of criminal threats, the People were required to establish that defendant specifically intended for his statement to be taken as a threat, and that Sharon was in a state of "sustained fear for [her] own safety or for [her] immediate family's

---

[4] We address *post* defendant's contention that the trial court erred by not providing the jury with a limiting instruction.

8

safety." (§ 422, subd. (a).) "The prosecution must additionally show that the nature of the threat, both on 'its face and under the circumstances in which it is made,' was such as to convey to the victim an immediate prospect of execution of the threat and to render the victim's fear reasonable." (*People v. Garrett* (1994) 30 Cal.App.4th 962, 966-967.) Whether a person's fear is reasonable can be based on surrounding circumstances, and not just words alone (*People v. Franz* (2001) 88 Cal.App.4th 1426, 1446), and "[t]he victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear" (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156). On appeal, defendant acknowledges, and we agree, that evidence of Sharon's knowledge of defendant's statement was relevant to prove her state of mind at the time of defendant's threats, and was not made inadmissible by the hearsay rule. (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 [a statement that is circumstantial evidence of state of mind is not hearsay].)

Defendant claims, however, the trial court abused its discretion by not excluding the evidence under Evidence Code section 352, which authorized the court to "exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Riggs* (2008) 44 Cal.4th 248, 290.) Generally, " '[e]vidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*Ibid.*) In deciding whether evidence should be excluded pursuant to Evidence Code section 352, " ' [t]he court must consider " 'the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relative to the main or only a collateral issue, and the necessity of the evidence to the proponent's case as well as the reasons recited in section 352 for exclusion.' " ' " (*People v. Houston* (2005) 130 Cal.App.4th 279, 304.) The prejudice that Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defendant that naturally flows from relevant, highly probative evidence.

9

(*People v. Zapien* (1993) 4 Cal.4th 929, 958.) Rather, "[p]rejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues …." (*People v. Crew* (2003) 31 Cal.4th 822, 842.)

Defendant argues the evidence of his statement should have been excluded because it was minimally probative of Sharon's state of mind, was cumulative of other evidence of Sharon's reasonable and sustained fear and was highly inflammatory and prejudicial.

Initially, the evidence was probative of Sharon's state of mind at the time of defendant's threats. Sharon acknowledged during the Evidence Code section 402 hearing that she was not specifically thinking about defendant's prior statement when he was making his threats, but rather about him being drunk and abusive. However, Sharon added that she *was* thinking about how defendant "ha[d] been a bad person before," that she took him more seriously because she was aware of his criminal history, and that her knowledge of defendant's statement "probably" contributed "some" to her fear on the night of defendant's threats. Further, moments after defendant's threats Sharon told the 911 dispatcher that defendant had been recently incarcerated at Pelican Bay, and she testified at trial that she did so to warn law enforcement that defendant was "not … just a regular person out there." In sum, although the trial court acknowledged Sharon was "waffly" about whether defendant's specific statement was on her mind at the time of the incident, her understanding of defendant's criminal history was relevant to her state of mind on the night of the incident, an essential element of the crime with which defendant was charged. (See *People v. Garrett*, *supra*, 30 Cal.App.4th at pp. 966-968 [in criminal threats prosecution, admission of victim's knowledge of defendant's prior manslaughter conviction was proper to show she was reasonably in a state of sustained fear for her safety].)

10

Next, the challenged evidence was not cumulative. Under Evidence Code section 352, evidence of uncharged offenses may be inadmissible where "the evidence would be merely cumulative regarding an issue that was not reasonably subject to dispute," and thus the "prejudicial effect of such evidence would outweigh its probative value." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 406; see *People v. Evers* (1992) 10 Cal.App.4th 588, 599, fn. 4 ["Evidence is cumulative if it is repetitive of evidence already before the jury"]; *People v. Williams* (2009) 170 Cal.App.4th 587, 610-611 [cumulative evidence may "create[ ] a substantial danger of undue prejudice" and "unduly consume[ ] the court's time"].) Here, Sharon was entitled to identify each of the reasons she feared defendant, including her belief that defendant had recently been released from prison after having been convicted of murder, her belief that defendant possessed a gun, and because he was loud, intoxicated, and swearing.

Additionally, Sharon's fear was subject to dispute. During trial defense counsel pointed out that Sharon "sound[ed] fairly calm" and had "a little giggle" while speaking with the 911 dispatcher, and Deputy Foster testified that Sharon did not seem overly nervous or fearful when he interviewed her. Evidence that Sharon feared defendant in part due to her knowledge of his criminal history was probative of that issue and not cumulative.

As for the prejudicial effect of defendant's statement, evidence of other crimes evidence is inherently prejudicial, and evidence that defendant was convicted of murder and incarcerated at Pelican Bay could certainly have cast defendant in an unfavorable light. (*People v. Steele* (2002) 27 Cal.4th 1230, 1245.) Indeed, the prejudicial effect was greater here because it appears defendant was neither convicted of murder nor incarcerated at Pelican Bay.

However, three factors mitigated the prejudicial effect of the evidence. First, the evidence was introduced only through Sharon's brief testimony about what defendant had told her husband, and her brief statement to the 911 dispatcher. The evidence was not

11

admitted via a certified record of conviction, defendant's sworn testimony at trial, or some other means indicating that defendant had indeed been convicted of murder. (See *People v. Calderon* (1994) 9 Cal.4th 69, 75 [high risk of prejudice where charged offenses and prior conviction allegation are tried simultaneously].) Nor did Sharon testify about any details of defendant's purported conviction or provide any basis for her belief that defendant had been convicted of murder beyond his statement. As a result, a reasonable jury could have found defendant's statement to be nothing more than false bravado.

Second, Sharon testified that defendant said he was *convicted* of murder and had served a lengthy prison term, and therefore it is unlikely the jury would have sought to punish defendant for an uncharged murder. (*People v. Loy* (2011) 52 Cal.4th 46, 61; *People v. Falsetta* (1999) 21 Cal.4th 903, 917; *People v. Balcom* (1994) 7 Cal.4th 414, 427.) Third, the prosecutor did not refer to the statement at all during closing argument, and defense counsel only mentioned his statement to note that it "doesn't matter." The evidence was not a focal point of either party's argument.

Based on the above, we cannot conclude the trial court's decision to admit the evidence was an abuse of discretion. The evidence was probative of Sharon's state of mind and not cumulative, and while the evidence was inherently prejudicial, the prejudicial effect of the evidence was mitigated somewhat. The court's ruling did not "exceed[ ] the bounds of reason." (*People v. DeJesus*, *supra*, 138 Cal.App.4th 32.)

## II. Instructional Error Claim

Defendant contends the trial court erred by failing to instruct the jury sua sponte regarding the limited purpose of Sharon's testimony about defendant's statement concerning his criminal history. (See CALCRIM Nos. 303 ["During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other"] & 375 [standard limiting instruction when admitting character evidence].) Alternatively, defendant claims ineffective assistance of counsel to

12

the extent the court did not have a duty sua sponte to instruct, and he forfeited his claim of instructional error by not objecting at trial or proposing an instruction. As we will explain, defendant forfeited his claim of error by failing to object or request a limiting instruction, and in doing so trial counsel's conduct was not constitutionally ineffective.

A. Forfeiture

As defendant acknowledges, the Evidence Code requires parties to request limiting instructions: "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Evid. Code, § 355, italics added; see *People v. Murtishaw* (2011) 51 Cal.4th 574, 590 [no duty to give a limiting instruction sua sponte on the consideration of victim impact evidence].) Failure to request a limiting instruction generally forfeits the issue on appeal. (*People v. Valdez* (2012) 55 Cal.4th 82, 149; *People v. Cowan* (2010) 50 Cal.4th 401, 479.)

There is a limited exception to the general rule of forfeiture in the "occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." (*People v. Collie* (1981) 30 Cal.3d 43, 64; *People v. Murtishaw*, *supra*, 51 Cal.4th at p. 590; *People v. Rogers* (2006) 39 Cal.4th 826, 854.) The exception is inapplicable here because the evidence of defendant's statement was not a dominant part of the evidence and, as discussed above, was not minimally relevant. While the evidence was prejudicial, as we discussed *ante*, we do not conclude the evidence here was the kind of "occasional extraordinary case" requiring the court to instruct the jury sua sponte. Thus, defendant forfeited his claim by failing to request an instruction.

B. Ineffective Assistance of Counsel Claim

Anticipating forfeiture, defendant claims trial counsel was constitutionally ineffective for failing to request a limiting instruction. To establish a claim of ineffective assistance of counsel, defendant must prove: (1) trial counsel's representation was

13

deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficiency prejudiced defendant. (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) "When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Mai*, at p. 1009.)

The record is silent as to why defense counsel did not request a limiting instruction, and we will find ineffective assistance only if there could be no reasonable tactical purpose for counsel's decision. (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.) One interpretation of the record supports the conclusion that counsel simply neglected to request a limiting instruction, especially after the trial court indicated that it would be required to provide one to the jury. However, another interpretation is that counsel decided a limiting instruction would do more harm than good by reminding the jury of Sharon's testimony about defendant's statement. (See *People v. Freeman* (1994) 8 Cal.4th 450, 495 [failure to request limiting instruction on prior crimes evidence not ineffective assistance because trial counsel " 'may well not have desired the court to emphasize the evidence' "]; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 934 [ineffective assistance claim rejected where failure to seek limiting instruction concerning gang evidence may have been legitimate tactical decision].) As we have discussed, Sharon testified about defendant's statement only briefly, and the prosecutor did not mention defendant's statement during closing argument, let alone suggest that the jury could or should consider the evidence for an improper purpose. Thus, we do not

14

conclude "there simply can be no satisfactory explanation" for counsel's failure to request a limiting instruction (*Mai*, at p. 1009).

Defendant argues *People v. Guizar* (1986) 180 Cal.App.3d 487 (*Guizar*) supports his claim of ineffective assistance, but that case is inapposite. In *Guizar*, a witness in the defendant's murder trial who failed to initially report the shooting later recounted that he had heard someone say defendant had " 'committed some murders before.' " (*Id.* at p. 490.) No evidence of the defendant's criminal history was offered at trial. (*Ibid.*) The trial court instructed the jury to consider the witness's statement only to establish his state of mind at the time he described the shooting. (*Ibid.*) During closing argument, the prosecutor suggested the witness did not report the shooting due to his belief that the defendant had committed " 'other murders.' " (*Ibid.*) On appeal, the reviewing court concluded the witness's reference to the defendant's other murders should have been excluded under Evidence Code section 352 because the statement referred to unproven serious offenses that had little or no relevance to the issues in the case, and that could have been prejudicial. (*Guizar*, at pp. 491-492.) In reaching that conclusion, the court rejected the Attorney General's argument that counsel's failure to object was a tactical decision, finding it to be inconceivable that counsel could have made the tactical decision to admit evidence that the defendant on trial for murder had committed other murders. (*Id.* at p. 492, fn. 3.)

In his reply brief, defendant points to two other cases, *People v. Robertson* (1982) 33 Cal.3d 21, and *Crotts v. Smith* (1996 9th Cir.) 73 F.3d 861. The issue in those cases was whether trial counsel was constitutionally ineffective for failing to object to the admission of a witness's testimony about the defendant's statement that he had committed other murders. (*Robertson*, at pp. 41-42 [defense counsel ineffective for failing to object to prosecution eliciting victim's testimony that the defendant told her he had killed two other women]; *Smith*, at pp. 865-866 [defense counsel ineffective for

15

failing to object to prosecution eliciting testimony that the defendant told a witness he " 'had just done ten years for killing a policeman' "].)

But here, the issue is not whether counsel was constitutionally ineffective for failing to object to the admission of the evidence pursuant to Evidence Code section 352. Defendant did object on that basis, which the court overruled. Rather, the issue is whether counsel was constitutionally ineffective for failing to request a limiting instruction. Unlike the cases defendant cites, where counsel could have had no tactical basis for admitting evidence of other murders, here counsel had a tactical basis for not requesting a limiting instruction.

Defendant further contends the trial court's failure to properly instruct the jury violated his constitutional rights to due process and a fair trial. As we have explained, the court did not abuse its discretion when it admitted Sharon's testimony, and while the trial court did not explain the limited, nonhearsay purpose of Sharon's testimony, that omission did not " 'so infect[ ] the entire trial that the resulting conviction violate[d] due process.' " (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; cf. *People v. Johnson* (2004) 119 Cal.App.4th 976, 985-986 [instructional error compels reversal per se where the trial court lowered the prosecution's burden of proof below the due process requirement of proof beyond a reasonable doubt].)

### III.  *Prosecutorial Misconduct Claim*

Defendant next claims the prosecutor committed misconduct during closing argument by inviting the jury to imagine why she could not call Candy, his girlfriend, as a witness. Defendant forfeited this claim as well, and trial counsel was not constitutionally ineffective for failing to object.

A.  Procedural Background

During closing argument, defense counsel noted with respect to the resisting charge that the wood to fuel defendant's wood burning stove was stored in a shed in the backyard. He argued that the jury could reasonably infer that defendant was not fleeing

16

from law enforcement at the time he was arrested, but rather was retrieving wood for the stove.

The prosecutor argued on rebuttal: "[D]efense liked to say that, oh, it was a -- just an innocent man going out to get firewood. I guess, unlike everyone else who has a fireplace, he didn't keep any in his house. But you know what I didn't hear during this trial? Any evidence. I heard the defense say at the beginning of his closing that, you know, the defense is allowed to imply and the defense is allowed the [*sic*] allude, and he did. He implied and he alluded, but he didn't actually give any evidence. I mean, the defendant's girlfriend was there. Why -- why isn't she here?" Defense counsel objected on the basis of the "Fifth Amendment," which the trial court overruled. The prosecutor continued, "The girlfriend is not the defendant. The girlfriend is a witness. It doesn't require the defendant to take the stand to say what she saw, what she heard. She's not here. I would have liked to call her, but you can probably imagine why I can't." Defense counsel did not object.

B. Forfeiture

Initially, defendant forfeited his claim of error by failing to object to the prosecutor's statement. " '[A] defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Clair* (1992) 2 Cal.4th 629, 662, quoting *People v. Benson* (1990) 52 Cal.3d 754, 794.) "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' " (*People v. Green* (1980) 27 Cal.3d 1, 27.) While the rule is inapplicable where the harm could not have been cured (*Clair*, at p. 662), misconduct can rarely not be cured by admonition. (*People v. Pitts* (1990) 223 Cal.App.3d 606, 692.)

17

Here, there is no indication that any harm caused by the prosecutor's comment could not have been remedied by admonition.

Defendant urges us to exercise our discretion to review his claim despite his failure to object on the basis that we have discretion to consider a claim of prosecutorial misconduct where the case was closely balanced, and where the misconduct was material to the jury's verdict. (*People v. Bryden* (1998) 63 Cal.App.4th 159, 182.) Our Supreme Court has rejected this exception to the waiver rule. (*People v. Green*, *supra*, 27 Cal.3d at pp. 28-34 [exception to objection requirement where case is " 'closely balanced' " and defendant's guilt "is in 'grave doubt' " "is not properly an exception to the objection requirement"], abrogated on other grounds by *People v. Martinez* (1999) 20 Cal.4th 225, 234.) While we generally have discretion to review forfeited claims (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7), we decline to exercise that discretion here.

C. Ineffective Assistance Claim

Again, anticipating our conclusion of forfeiture, defendant claims trial counsel was constitutionally ineffective for failing to object. We described the standard for reviewing such claims, *ante*.

The record is silent as to why defense counsel failed to object to the prosecutor's argument; therefore, ineffective assistance can only be shown if there could be no satisfactory explanation for counsel's failure to object. (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.) " '[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one' [citation], and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 675.) "Nonetheless, deference to counsel's performance is not the same as abdication. [Citation.] '[I]t must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions.' " (*Ibid.*)

" 'Prosecutorial misconduct implies the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " (*People v. Haskett* (1982) 30 Cal.3d 841, 866, quoting *People v. Strickland* (1974) 11 Cal.3d 946, 955.)  While a prosecutor has a duty to prosecute vigorously, and may comment on the evidence and reasonable inferences to be drawn therefrom, "[a] prosecutor commits misconduct by referring in argument to matters outside the record." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026.)

As relevant here, it is misconduct for a prosecutor to suggest that a witness who was not called to testify would have testified to certain facts.  (See, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 452 [prosecutor improperly suggested in closing that she had evidence supporting her line of questioning but chose not to present it to save time]; *People v. Hill* (1998) 17 Cal.4th 800, 829 [prosecutor's statement that she "could have had somebody come in here and analyze" substance was misconduct because it implied that an expert would have testified favorably to the prosecution, and no such witness was called]; *People v. Hall* (2000) 82 Cal.App.4th 813, 817 [prosecutor "went too far" by arguing an absent officer's testimony would have been repetitive because it was akin to telling "the jury that the witness, if called, would have testified exactly as (the other officer) did, in a manner favorable to the prosecution"]; *People v. Gaines* (1997) 54 Cal.App.4th 821, 825 [misconduct for prosecutor to suggest, among other things, that defense did not call a witness out of concern that the witness's testimony would have impeached defendant's testimony because "prosecutor was in plain effect presenting a condensed version of what he was telling the jury would have been (the witness's) testimony"].)

The prosecutor's comment defendant complains of on appeal consists of three parts:  (1) the observation that defendant did not call Candy as a witness; (2) the assertion that the prosecutor "would have liked to call" Candy as a witness; and (3) the statement that the jury "can probably imagine why" the prosecutor could not call Candy to testify.

19

The prosecutor's first statement, commenting on defendant's failure to call Candy as a witness, was not objectionable because a prosecutor may comment on a defendant's failure to call logical witnesses. (See *People v. Winbush* (2017) 2 Cal.5th 402, 482.) The second statement, that the prosecutor "would have liked to call" Candy as a witness, perhaps vaguely suggested that Candy would have testified favorably to the prosecution. However, that statement did not provide any summary of what Candy's testimony would have been, such that the prosecutor was making herself her own witness by offering unsworn testimony, and counsel could have made the tactical choice to not highlight that argument by objecting to it.

Finally, the prosecutor's statement that the jury "could imagine" why she was unable to call Candy as a witness was arguably improper because it invited the jury to speculate about the reason for Candy's absence. The two most obvious possible inferences the jury could have drawn from the prosecutor's comment were that Candy refused to testify against defendant out of a sense of loyalty to him, and that defendant had convinced, persuaded, or coerced Candy to not testify against him. However, the record does not eliminate the possibility of an informed tactical choice. Counsel could have decided the most reasonable inference from the prosecutor's comment was that Candy was refusing to testify due to her loyalty to defendant and could have decided to rely on the jury's ability to consider the case based on the evidence presented, as it was instructed to do. (See CALCRIM No. 104 ["Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence"]; *People v. Osband* (1996) 13 Cal.4th 622, 717 [" '[W]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to

20

persuade' "].) Counsel's conceivable tactical basis for not objecting renders his ineffective assistance claim unpersuasive.[5]

## IV.   Sentencing Claims

Finally, defendant contends the trial court abused its discretion by refusing to dismiss one or both of his prior strikes as he requested in his motion under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*), and by not dismissing one or both of his prior serious felony convictions for purposes of the five-year prior conviction enhancements under section 667, subdivision (a)(1).  The trial court did not abuse its discretion when it denied his *Romero* motion, and defendant forfeited his claim as to the prior conviction enhancements.

### A.  Procedural Background

After trial, defendant asked the trial court to dismiss his prior strikes--robbery in 1985 and assault with a deadly weapon in 2000--in the interest of justice pursuant to section 1385 and *Romero*.  Defendant's written request argued that the court should dismiss the strikes based on the application of mitigating factors identified in section 1385, subdivision (c), specifically:  (1) the Three Strikes law constituted an enhancement, the application of which could result in a sentence of more than 20 years (§ 1385, subd. (c)(2)(C)); (2) the current offense was not a violent felony (*id.*, subd. (c)(2)(F)); and (3) the enhancements were based on convictions more than five years old (*id.*, subd. (c)(2)(H)).  He further argued that dismissal of his prior strikes would not endanger public safety (*id.*, subd. (c)(2)) because his most serious criminal offenses were remote in time, the charged threats were empty, and he had had an opportunity to reflect on his actions.

---

[5] Defendant alleges cumulative error.  His claim fails for lack of multiple errors to cumulate.

The prosecution opposed defendant's request, arguing that section 1385, subdivision (c) did not apply to the Three Strikes law, and defendant's lengthy criminal history placed him squarely within the spirit of the Three Strikes law. The opposition further argued that the trial court should not exercise its discretion under section 1385, subdivision (c) to dismiss defendant's two five-year prior conviction enhancements (§ 667, subd. (a))--relief defendant had not sought--because defendant's criminal history demonstrated the risk he posed to public safety. Defendant filed a supplemental *Romero* motion asking the trial court to dismiss his strikes because he fell outside the spirit of the Three Strikes law.

At a hearing, defense counsel acknowledged section 1385, subdivision (c) did not apply to *Romero* motions, but requested that the trial court dismiss defendant's prior strikes under subdivision (a) of section 1385. Counsel did not request that the court dismiss defendant's prior convictions for purposes of the prior conviction enhancements. The prosecution again argued that defendant's extensive criminal history placed him within the spirit of the Three Strikes law.

The trial court ruled: "There are a number of factors that the Court considers whether or not to grant a *Romero* motion. I would agree that the 1985 conviction for the [§] 211 is very remote. But another thing that the Court considers is whether or not [defendant] was able to stay out of custody for any length of time. And, quite frankly, he simply wasn't. I mean, there was zero length of time that he was able to stay out of custody.

"Your argument that he doesn't have convictions of violence is disingenuous. Granted, the California Penal Code labels certain crimes as serious and violent felony. But just looking at the convictions he's got, obstructing, resisting a public officer. He has the robbery. He has another obstructing, resisting a public officer. He has a violation of parole in 1990, 1991, 1992. [¶] In 1993, he has a false imprisonment, threatening force on a crime witness, taking a vehicle for a temporary use, misdemeanor assault. Then in

22

1996, violation of parole; '97, violation of parole; '98, violation of parole. Actually, two in 1998. [¶] He's got another [§] 245[, subd.] (a)(1) that he got ten years of state prison out of Solano. And that was assault with a deadly weapon. Another violation of parole. It just goes on and on. [¶] And 40 years of criminal history is laid out in these RAP sheets. I understand that your -- I really don't think, quite frankly, that your argument that he was arrested a number of times that didn't result in conviction is really not helpful. I counted nine arrests without a conviction prior to 2000. And 16 arrests after 2000 that didn't lead to conviction. [¶] So in addition to all of the convictions he has, he's also out there doing crimes that he was potentially arrested for. That does not help him at all. [¶] So he is basically out there. He is a one-man crime operation. He is exactly the type of person that the three strikes law is meant for.

"This is a person that has taken zero opportunities to better himself in prison. The Court, quite frankly, just doesn't believe [defendant] that after 40 years of committing crimes and being in and out of prison, all of a sudden he's had a light bulb moment and now he's going to be great if we let him out. So the Court just again finds that completely disingenuous.

"The other concern the Court has is if I don't -- if I grant the *Romero* motion and [defendant] at some point is released from prison, he represents a tremendous risk to public safety. And that again is based on his prior convictions. These are not things that are only drug related. They are crimes that the Court would consider of violence, evading a peace officer, resisting a peace officer, threatening people that are going to -- that are going to potentially testify against him, along with all the other ones. [¶] So, again, that's another factor that the Court can consider. And the Court does believe that [defendant] presents a tremendous risk to public safety, as well as to law enforcement based on his priors as well. [¶] ... [¶]

"Oh, with regard -- I sort of was concerned also, [defense counsel], about your argument that the violations of probation, there's really no basis for them. The Court is

23

not in a position at this moment in time to reanalyze or even retry the basis for all of the convictions and all of the violations of probation. The Court has to consider those true. [¶] And while it is -- your statement that we don't know what the basis is true, the Court has to consider that he did have these violations of parole. I don't know what they were based on. But they were done and he went back to prison for those. [¶] So the Court is not in a position, and I think it would be highly inappropriate for the Court to go and try and look behind those convictions, look behind those parole violations, and determine that they were baseless. The Court simply doesn't have jurisdiction. [¶] The Court can only look at what the RAP sheet is, what the convictions are, what the parole violations are, and make a determination based on that, as well as the current offense. [¶] And so for those reasons, the Court is going to decline to strike any strikes or enhancements at this time." Defendant did not object.

B. Romero Motion

"Under California's Three Strikes law, a defendant's sentence is enhanced upon proof that the defendant has been previously convicted of a 'strike'—a violent felony as defined in section 667.5, subdivision (c), or a serious felony as defined in section 1192.7, subdivision (c)." (*People v. Denard* (2015) 242 Cal.App.4th 1012, 1024.) Section 1385, subdivision (a) states in relevant part that a "judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." Discretionary dismissal under that subdivision may include a strike prior conviction. (*Romero*, *supra*, 13 Cal.4th at pp. 530-531; *People v. Williams* (1998) 17 Cal.4th 148, 151 (*Williams*).) In dismissing a strike for purposes of the Three Strikes law, the sentencing court must determine whether "the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161.)

24

We review the trial court's rulings to dismiss prior strikes for abuse of discretion. (*Williams*, *supra*, 17 Cal.4th at p. 152; *People v. Carmony* (2004) 33 Cal.4th 367, 375 (*Carmony*).) A trial court does not abuse its discretion unless it was unaware of its discretion, it refused the invitation to strike for impermissible reasons, or "its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, at p. 377.) The burden is on the party attacking the sentence to clearly show that the sentencing decision is irrational, arbitrary, or contrary to law. (*Id.* at p. 376.) Absent such a showing, we presume the trial court acted to achieve legitimate sentencing objectives, and we will not set aside its discretionary determination. (*Id.* at pp. 376-377; see *People v. Gillispie* (1997) 60 Cal.App.4th 429, 434 [we presume the trial court knew and correctly applied the law].) " '[W]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, [the reviewing court] shall affirm the trial court's ruling, even if [it] might have ruled differently in the first instance.' " (*Carmony*, at p. 378.)

Defendant raises several arguments but fails to establish an abuse of discretion. First, defendant observes that his prior strikes were remote in time and he committed the robbery when he was 22 years old and argues that although the remoteness of his convictions and his youth at the time he committed his prior offenses are insufficient on their own to take him outside the spirit of the Three Strikes law, they were factors in mitigation. (See *People v. Avila* (2020) 57 Cal.App.5th 1134, 1141, 1142.) But the remoteness of the prior convictions or defendant's age when he was convicted do not establish an abuse of discretion; the trial court recognized defendant's robbery conviction was "very remote," and declined to dismiss the prior strikes due to defendant's lengthy and unabated criminal history.

Second, defendant argues that the trial court abused its discretion when it determined he did not take advantage of his rehabilitative time in prison, observing that he earned his high school diploma and took college classes while incarcerated, and

worked full time after his most recent period of incarceration. However, the court's comment that defendant "has taken zero opportunities to better himself in prison" must be understood in the context of its subsequent comment that defendant's criminal history involved "40 years of committing crimes and being in and out of prison," and its disbelief that defendant is "going to be great if we let him out." In other words, the court's comment that defendant failed to take advantage of rehabilitative time in prison referred to its observation that nothing defendant had done while incarcerated had led him to stop committing crimes. That observation was not an abuse of discretion.

Third, defendant argues his current offense was nonviolent, and the trial court would have imposed a substantial sentence even if it dismissed one strike. There is nothing to suggest the court was not aware of that fact, and this argument does not establish an abuse of discretion.

Defendant raises several arguments for the first time in his reply brief. He argues that the trial court disregarded the remoteness of his prior strikes due to his repeated convictions for crimes the court characterized as violent but were not defined as such in the Penal Code, the court failed to consider his age when sentenced, and the court improperly relied on crimes for which defendant was not convicted. Defendant provides no explanation for why he raised these arguments for the first time in his reply brief. In the absence of a justifiable reason for the delay, we decline to consider them. (*Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 583 ["points raised for the first time in a reply brief on appeal will not be considered, absent good cause for failure to present them earlier"].)

C. Prior Conviction Enhancements

Defendant contends the trial court abused its discretion by declining to strike either of his two five-year prior serious felony conviction enhancements. (§ 667, subd. (a).) He argues several factors identified in section 1385, subdivision (c) apply, and the

26

court improperly found that dismissing the enhancements would endanger public safety because it focused exclusively on his current dangerousness.

Section 1385, subdivision (c)(1) provides, "[n]otwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute."  But here, defendant did not request that the trial court dismiss his five-year prior conviction enhancements.  Instead, defendant asked the trial court to dismiss his prior strikes for purposes of the Three Strikes law under section 1385, subdivision (c) and *Romero*.  After the prosecution filed its opposition to his motion, defendant filed a supplemental *Romero* motion, and he acknowledged at the hearing that section 1385, subdivision (c) did not apply to his motion and argued that the court should dismiss his prior strikes under section 1385, subdivision (a).  As our high court has observed, " '[a] party in a criminal case may not, on appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial ….'' (*People v. Scott* (2015) 61 Cal.4th 363, 406; see *Carmony*, *supra*, 33 Cal.4th at pp. 375-376 ["any failure on the part of a defendant to invite the court to dismiss under section 1385 … forfeits his or her right to raise the issue on appeal"]; *People v. Coleman* (2024) 98 Cal.App.5th 709, 724 [the defendant's argument the trial court should have dismissed enhancements under § 1385, subd. (c)(2)(B), (c)(2)(C), was "forfeited for failure to request that the trial court strike the enhancements"].)  Because

defendant did not request that the trial court dismiss his prior conviction enhancements, he forfeited his contention that the trial court abused its discretion by failing to do so.

## DISPOSITION

The judgment is affirmed.

/s/
WISEMAN, J.*

We concur:

/s/
KRAUSE, Acting P. J.

/s/
BOULWARE EURIE, J.

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28